Receipt number AUSFCC-6154752

## IN THE UNITED STATES COURT
## OF FEDERAL CLAIMS

|  |  |
|---|---|
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, CIGNA HEALTHCARE OF ARIZONA, INC., CIGNA HEALTHCARE OF ILLINOIS, INC., CIGNA HEALTHCARE OF NORTH CAROLINA, INC., and CIGNA HEALTHCARE OF TEXAS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | 20-546 C |

### COMPLAINT

Plaintiffs Cigna Health and Life Insurance Company, Cigna Healthcare of Arizona, Inc., Cigna Healthcare of Illinois, Inc., Cigna Healthcare of North Carolina, Inc., and Cigna Healthcare of Texas, Inc. bring this action against the United States of America.

### INTRODUCTION

1.      This is a Tucker Act suit to recover two types of payments the Government owes Plaintiffs under the Patient Protection and Affordable Care Act ("ACA" or "Act"). The first are risk corridors payments owed for the 2014 through 2016 benefit years to Cigna Health and Life Insurance Company, Cigna Healthcare of Arizona, Inc., and Cigna Healthcare of Texas, Inc. (together, "Cigna"). The second are cost-sharing reduction ("CSR") payments owed for the 2017 benefit year through the present to Cigna Health and Life Insurance Company, Cigna Healthcare of Arizona, Inc., Cigna Healthcare of Illinois, Inc., and Cigna Healthcare of North Carolina, Inc. (together, "Cigna Health"). In both cases, the Government has statutory, regulatory, and implied-in-fact contractual obligations to make these payments, but has failed to do so. "The Government

should honor its obligations." *Maine Cmty. Health Options v. United States*, --- U.S. ---, No. 18-1023, 2020 WL 1978706, at *17 (U.S. Apr. 27, 2020).

2.      The ACA is a landmark law that put healthcare reform into action by helping people in the United States to get health insurance, by providing federal financial assistance to those who need help paying for health insurance, and by guaranteeing the availability of healthcare to all Americans regardless of their medical history.

3.      For qualifying health plans ("QHPs") that agreed to participate in the public exchanges offering coverage under the ACA, like Plaintiffs, the new law injected great uncertainty with respect to the risks of participating in the exchanges.  Thus, to entice QHPs to participate in the public exchanges, Congress created several programs under the ACA that promised to help ameliorate some of these significant risks.  Those risk-sharing programs include the "risk corridors" and "cost-sharing reduction" programs.

4.      *Risk corridors*:  The risk corridors program is a temporary regime created by the ACA that requires the Government "to share in the profits or losses resulting from inaccurate rate setting" in the first three years that QHPs offered insurance coverage on the public exchanges (2014 to 2016).  *See* 77 Fed. Reg. 73,118, 73,12 (Dec. 7, 2012).  Under section 1342 of the ACA, the Secretary of Health and Human Services ("HHS") "shall pay" risk corridors payments to eligible QHPs like Cigna in statutorily defined amounts.  42 U.S.C. § 18062(b).  The Act's implementing regulations likewise provide that HHS "will pay" risk corridors payments to eligible QHPs.  45 C.F.R. § 153.510(b).  This clear language "created a Government obligation to pay insurers the full amount set out in § 1342's formula."  *Maine Cmty. Health Options*, 2020 WL 1978706, at *7.

5.      The Government's obligation to make annual risk corridors payments also sounds in contract.  Establishing the risk corridors program constituted an offer to make the requisite annual payments in exchange for health insurers' annual agreement to offer QHPs on the ACA exchanges, to accept the uncertain risks on those exchanges, and to pay any corresponding risk corridors collection charges.  The Government's offer invited acceptance by performance—*i.e.*, signing up to offer QHPs on the ACA exchanges.  And Cigna accepted this offer when it agreed to offer QHPs on certain ACA exchanges in the 2014, 2015, and 2016 benefit years.

6.      Despite these clear obligations, the Government failed to make full, annual risk corridors payments to Cigna (and many other insurers).  Instead, it paid just a small fraction of what it owed.  At times, it suggested that this was appropriate because the risk corridors program was "budget neutral," so payments out were limited by the amount of payments in.  But the Supreme Court has rejected this view, explaining that "[n]othing in § 1342 requires the Risk Corridors program to be budget neutral."  *Maine Cmty. Health Options*, 2020 WL 1978706, at *7.

7.      For the 2014–2016 benefit years, the Government owes Cigna at least $120,209,425.82 in risk corridors payments.

8.      *CSR reimbursements*:  The cost-sharing reduction, or CSR, program is designed to reduce the out-of-pocket costs, such as copayments, coinsurance, and deductibles, that certain low-income people pay.  *See* 42 U.S.C. §§ 18022(c)(3), 18071(c)(2).  Under Section 1402 of the ACA, QHP issuers must pay a portion of these out-of-pocket costs for their eligible customers.  In turn, Section 1402 requires the Government to reimburse the issuers for these amounts by "mak[ing] periodic and timely payments to the issuer equal to the value of the reductions."  *Id.* § 18071(c)(3)(A).  These payments must be made in "advance."  *Id.* § 18082(c)(3).  Implementing regulations therefore created a payment program under which the Government must make

"monthly advance payments to issuers to cover project cost-sharing reduction amounts."  78 Fed. Reg. 15,409, 15,486 (Mar. 11, 2013).

9.      As with the risk corridors program, the Government's CSR payment obligation is not just statutory and regulatory, but also contractual.  In both cases, establishing the program was an offer that QHP issuers could accept by performing—and Cigna Health did so.  Cigna Health's performance thus formed an implied-in-fact contract with the Government for full and timely reimbursements to cover Cigna Health's CSR payments to health care providers.

10.     After making monthly advance CSR payments for three years, the Government suddenly stopped in October 2017—even though insurers like Cigna Health are obligated by law to keep making CSR payments to their customers' health care providers, and have done so.  The Government's rationale was that Congress supposedly never appropriated funds to make these payments.  The Government's refusal to honor its reimbursement obligations harms the insurers, makes it harder for people to afford health insurance, and unsettles the insurance markets.

11.     By statute, regulation, and contract, the Government owes Cigna Health for unpaid CSR reimbursements from October 2017 to the present.  For 2017 and 2018, these amounts come to at least $195,875,416.  The final figures for 2019 are not yet available, but Cigna Health has incurred those expenses and seeks to recover them here as well, with the exact amount subject to proof at trial.

12.     The Court should order the Government to honor its obligations by paying Plaintiffs the outstanding amounts they are owed under the risk corridors and CSR programs.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction and venue is proper under the Tucker Act because Cigna brings claims for damages over $10,000 against the United States founded on the Government's violations of money-mandating statutory provisions and regulations and implied-in-fact contracts

with the United States.  *See* 28 U.S.C. § 1491(a)(1); *Maine Cmty. Health Options*, 2020 WL 1978706, at *13 (holding that insurers seeking to recover risk corridors payments "properly relied on the Tucker Act to sue for damages in the Court of Federal Claims").

14.     The governmental actions or decisions at issue were taken on behalf of the United States in the District of Columbia.

## PARTIES

15.     Plaintiff Cigna Health and Life Insurance Company is an insurance company organized under the laws of Connecticut with its principal place of business in Bloomfield, Connecticut.

16.     Plaintiff Cigna Healthcare of Arizona, Inc. is an insurance company organized under the laws of Arizona with its principal place of business in Phoenix, Arizona.

17.     Plaintiff Cigna Healthcare of Illinois, Inc. is an insurance company organized under the laws of Illinois with its principal place of business in Chicago, Illinois.

18.     Plaintiff Cigna Healthcare of North Carolina, Inc. is an insurance company organized under the laws of North Carolina with its principal place of business in Raleigh, North Carolina.

19.     Plaintiff Cigna Healthcare of Texas, Inc. is an insurance company organized under the laws of Texas with its principal place of business in Irving, Texas.

20.     Plaintiffs were QHP issuers for the ACA health insurance exchanges in Arizona, Colorado, Florida, Georgia, Maryland, Missouri, Tennessee, and Texas in one or more of the relevant benefit years under the risk corridors and CSRs programs.

22.     Defendant is the United States of America.

## FACTUAL ALLEGATIONS

### I.    RISK CORRIDORS

#### A.    The Affordable Care Act's risk corridors program

23.    Congress enacted the Affordable Care Act in 2010.  Pub. L. No. 111-148, 124 Stat. 119 (2010).  The ACA aimed to expand health insurance coverage to millions of uninsured Americans, increase competition in health insurance markets, and decrease health care costs.  To these ends, it created health insurance marketplaces called Health Benefit Exchanges, in which insurers could sell health insurance plans to individuals and small groups.  Health plans issued through the Exchanges were required to satisfy specific criteria, and were known as Qualified Health Plans or "QHPs."  *See* 42 U.S.C. § 18021.

24.    The ACA made sweeping reforms in health insurance.  It requires health insurers that offer individual health insurance coverage in a state to accept every person in the state who applies for coverage.  Health insurers cannot deny coverage, exclude people due to pre-existing conditions, or set premiums according to individual health status.  Insurers participating on the Exchanges were required to offer a minimum level of benefits, some of which were previously subject to copays or other cost-sharing mechanism but were now mandated to be provided at no cost to insureds.

25.    These significant reforms brought significant risks.  Health insurers could not effectively predict how many people would sign up for coverage or what their medical costs would be.  Insurers had no data to predict the medical needs of these previously uninsured or underinsured customers, nor any model to set premium rates.

26.    Recognizing these uncertainties and aiming to induce insurers to participate in the Exchanges, Congress established a trio of premium-stabilization programs known as the "Three R's."  Relevant here is the temporary risk corridors program, which ran from 2014 through 2016.

*See* 42 U.S.C. §§ 18061–18063.  "The goal of the risk corridors program [was] to support the [Exchanges] by providing insurers with additional protection against uncertainty in claims costs during the first three years of the [Exchanges]."  CMS, *The Three Rs: An Overview*, Oct. 1, 2015, https://www.cms.gov/newsroom/fact-sheets/three-rs-overview.   "Due to uncertainty about the population during the first years of Exchange operation, issuers may not be able to predict their risk accurately, and their premiums may reflect costs that are ultimately lower or higher than pre-dicted."  CMS, *Regulatory Impact Analysis* 44 (Mar. 16, 2012) ("March 2012 Impact Analysis"), https://www.cms.gov/CCIIO/Resources/Files/Downloads/hie3r-ria-032012.pdf.   The risk corri-dors program would thus "protect against inaccurate rate setting in the early years of the Exchanges by limiting the extent of issuer losses and gains."  *Id.* at 43.

27.     The risk corridors program can protect against inaccurate rate setting by issuers only if the Government shares the risk.   Otherwise, the program's protections are illusory.  The Government recognized as much, explaining that the program "permits the Federal government and QHPs to share in the profits or losses resulting from inaccurate rate setting from 2014 to 2016." 78 Fed. Reg. 15,410, 15,412 (Mar. 11, 2013).

28.     The financial protections provided by Congress in the statutory premium-stabiliza-tion programs, including the risk corridors program, gave QHPs the security—backed by the full faith and credit of the United States—to become participating health insurers in their respective states' ACA markets, at considerable cost, despite the financial risks posed by the uncertain Ex-change markets.

29.     Section 1342 of the ACA created the risk corridors program by requiring the Sec-retary of HHS to establish a regime in which the Government and certain participating health plans

in the individual and small group markets share gains or losses resulting from inaccurate rate set-ting from 2014 through 2016.  *See* 42 U.S.C. § 18062.  The Government shares risk with QHPs by collecting "charges" if an insurer's QHP premiums exceed claims costs of QHP enrollees by a certain amount, and by making payments if those premiums fall short by a certain amount (subject to adjustments for taxes and certain expenses).

30.     Section 1342 establishes a specific payment methodology to determine these amounts.  QHPs with allowable costs that are less than 97 percent of the QHP's target amount are required to remit charges for a percentage of those cost savings to HHS.  QHPs with allowable costs greater than 103 percent of the QHP's target amount will receive payments from HHS to offset a percentage of those losses for each of calendar years 2014, 2015, and 2016.  42 U.S.C. § 18062(b)(1)–(2).

31.     All insurers that elect to enter into agreements to become QHPs must participate in the risk corridors program.

**B.      The Government's initial interpretation of § 1342 and Cigna's reliance on it**

32.     Congress directed HHS to establish and administer the risk corridors program en-acted in Section 1342.  HHS, in turn, delegated this authority to the Centers for Medicare and Medicaid Services ("CMS").  The agencies' initial interpretation of Section 1342, from 2010 to 2013, was that the program requires full and "prompt" payment of risk corridors payments and is not "budget neutral."

33.     In July 2011, CMS and HHS proposed a rule providing that "HHS would make payments to QHP issuers that are owed risk corridors amounts from HHS within a 30-day period after HHS determines that a payment should be made to the QHP issuer," and acknowledging that QHPs "will want prompt payment."  76 Fed. Reg. 41,929, 41,943 (July 15, 2011).  The agencies

reiterated this "prompt payment" requirement in the March 2012 final rule. 77 Fed. Reg. 17,219, 17,238 (Mar. 23, 2012). CMS and HHS "finaliz[ed] this section as proposed." *Id.* at 17,238.

34.     CMS and HHS also addressed whether the risk corridors program was to be "budget neutral." The answer was no. In March 2013—while health insurers, including Cigna, were contemplating whether to agree to participate in the new Exchanges—CMS and HHS declared in a final rule that "[t]he risk corridors program is not statutorily required to be budget neutral. *Regardless of the balance of payments and receipts, HHS will remit payment as required under Section 1342*." 78 Fed. Reg. 15,409, 15,473 (Mar. 11, 2013) (emphasis added).

35.     In reliance on HHS's and CMS's public statements, Cigna agreed to become a QHP issuer. In September 2013, Cigna executed QHP agreements to participate in the 2014 Exchanges for Arizona, Colorado, Florida, Tennessee, and Texas.

36.     CMS's implementing regulations parrot Section 1342's statutory formula, using the same thresholds and risk-sharing levels specified in the statute. *See* 45 C.F.R. § 253.510. And they prescribe the circumstances under which QHPs "must remit" charges to HHS, as well as the means by which HHS will determine those charge amounts. The rules also impose a 30-day deadline for a QHP to fully remit charge payments to HHS when the QHP's allowable costs in a calendar year are less than 97 percent of the QHP's target amount. *Id.* § 153.510(d).

37.     While the regulations are silent on when HHS must tender full risk corridors payments to eligible QHPs, HHS never retracted its 2013 guidance calling for "prompt payment" of those sums.

### C.   CBO and appropriations riders confirm that Section 1342 is not "budget neutral"

38.   In February 2014, the Congressional Budget Office issued an analysis explaining that "payments and collections under the risk corridor program will not necessarily equal one another:  If insurers' costs exceed their expectations, on average, the risk corridor program will impose costs on the federal budget; if, however, insurers' costs fall below their expectations, on average, the risk corridor program will generate savings for the federal budget."[1]

39.   Similarly recognizing that Section 1342 did not require budget neutrality, Congress in December 2014 enacted the omnibus appropriations bill for fiscal year 2015.  The bill limited the source for appropriations to make risk corridor payments by precluding the use of three large funding sources:

> None of the funds made available by this Act from the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) . . . relating to risk corridors.

Pub. L. No. 113-235, 128 Stat. 2491 (2014).

40.   Congress enacted essentially the same funding source restrictions for fiscal years 2016 and 2017.  *See* Pub. L. No. 114-113, 129 Stat. 2624 (2015); Pub. L. No. 115-31, 131 Stat. 135 (2017).

41.   While these appropriation acts restricted HHS's funding sources for risk corridors payments, they "neither repealed nor discharged § 1342's unique obligation."  *Maine Cmty. Health Options*, 2020 WL 1978706, at *17.  Section 1342 remains the law of the land.  *See id.* at *10.

---

[1] CBO, *The Budget and Economic Outlook: 2014 to 2024*, at 110 (Feb. 2014), http://www.cbo.gov/sites/default/files/cbofiles/attachments/45010-Outlook2014_Feb.pdf.

42.     Section 1342's language, structure, and purpose show that that HHS must pay QHPs annually.  For example, eligibility for the risk corridors program turns on "allowable costs" and "target amounts."  Both terms are defined on a plan year basis and are reset every year.  *See* 42 U.S.C. § 18062(c)(1)(A), (c)(2).  Likewise, Section 1342(a)'s very first sentence mandates that HHS establish "a program of risk corridors for calendar years 2014, 2015, and 2016."  *Id.* § 18062(a).  This language is revealing, since it indicates that there are multiple risk corridors— one for each of calendar years 2014, 2015, and 2016—for which there are separate payment obligations.

43.     That there is a new risk corridor every year is no surprise, given that everything about the program is annual.  The ACA mandates payment based on premiums and costs for each plan year from 2014–2016; all calculations are made on a plan year basis.  *See* 42 U.S.C. §§ 18062(c)(1)(A), 18062(c)(2); *see also id.* § 18062(b).  QHP issuers must submit their data to HHS annually for the preceding year, so that HHS may calculate annual risk corridors amounts based on that data.  45 C.F.R. § 153.530(d).  All QHPs are certified for an Exchange just one year at a time.  *See, e.g., id.* § 155.1045.

44.     Moreover, as noted above, the allowable costs and target amounts used to calculate risk corridors amounts must take into account the QHP issuers' risk adjustment and reinsurance payments or receipts, which are determined annually.  CMS regulations implemented these requirements in the final program.  45 C.F.R. § 153.510(a)–(d), (g).  Similarly, QHP issuers must remit risk corridors charges to the Government annually.  *Id.* § 153.510(d).  Even in the risk corridors context, the Government has made annual payments, albeit partial ones, further underscoring the annual nature of the payment obligation.

**D.     HHS reverses its interpretation of Section 1342**

45.     In March 2014—after Cigna had already agreed to participate in the Exchanges—HHS and CMS suddenly announced that HHS "intend[ed] to implement this [risk corridors] program in a budget neutral manner."  79 Fed. Reg. 13,743, 13,829 (Mar. 11, 2014).  In April 2014, the agencies issued a bulletin stating that "if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall."[2]

46.     Neither of these statements acknowledged that the Government was changing its position on budget neutrality or prompt payment, nor offered any explanation for the reversal. Indeed, HHS did not mention its prior positions on those topics, nor did it discuss Section 1342's mandatory "shall pay" language.

47.     In May 2014, however, HHS publically reaffirmed its obligation to make full risk corridors payments.  In a letter to the Government Accountability Office, HHS admitted that "Section 1342(b)(1) . . . establishes . . . the formula to determine . . . the amounts the Secretary must pay to the QHPs if the risk corridors threshold is met."[3]  And in June 2014, HHS sent letters to members of Congress stating that "[a]s established in statute, . . . [QHP] plans with allowable costs at least three percent higher than the plan's target amount will receive payments from HHS to offset a percentage of those losses."[4]

---

[2] CMS, Bulletin, *Risk Corridors and Budget Neutrality* 1 (Apr. 11, 2014), https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf.

[3] Letter from William B. Schultz, General Counsel, to Julia C. Matta, Assistant General Counsel (May 20, 2014) (attached as Exhibit A).

[4] Letter from Sec'y Sylvia M. Burwell to U.S. Senator Jeff Sessions 1 (June 18, 2014) ("Burwell Letter") (attached as Exhibit B).

48.     In reliance on the Government's statutory, regulatory, and contractual obligations and its public statements, Cigna in late 2014 executed QHP agreements to participate in the 2015 Exchanges for Arizona, Colorado, Florida, Georgia, Maryland, Missouri, Tennessee, and Texas.

49.     In February 2015, HHS confirmed "that the Affordable Care Act requires the Secretary to make full payments to issuers." 80 Fed. Reg. 10,749, 10,779 (Feb. 27, 2015).  And on November 2015, CMS issued a public announcement again confirming that "HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers."[5]

50.     In reliance on the Government's statutory, regulatory, and contractual obligations and its repeated public statements, Cigna in late 2015 executed QHP agreements to participate in the 2016 Exchanges for Arizona, Colorado, Georgia, Maryland, Missouri, Tennessee, and Texas.

51.     In 2016, the Government continued to recognize that full payment is required.  In September, CMS announced that "HHS recognizes that the Affordable Care Act requires the Secretary [of HHS] to make full payment to issuers.  HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required."[6]   And, asked in a September 2016 congressional hearing whether insurers were entitled to be "made whole on risk corridor payments even though there is no appropriation to do so," CMS's Acting Administrator responded:  "Yes. It is an obligation of the federal government."[7]

---

[5] Bulletin, CMS, *Risk Corridors Payments for the 2014 Benefit Year* (Nov. 19, 2015), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/RC_Obligation_Guidance_11-19-15.pdf.

[6] CMS, *Risk Corridors Payments for 2015* (Sept. 9, 2016) ("2015 Announcement"), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF.

[7] Testimony of A. Slavitt, Acting Administrator of the CMS, Committee on Energy & Commerce Hearing on "The Affordable Care Act on Shaky Ground: Outlook and Oversight" (Sept. 14, 2016), https://www.govinfo.gov/content/pkg/CHRG-114hhrg22696/html/CHRG-114hhrg22696.htm.

**E.      Cigna and HHS enter into implied-in-fact contracts**

52.      The Government's risk corridors payment obligation is not only a statutory and regulatory undertaking, but a contractual obligation too.  HHS repeatedly expressed its intent to enter into implied contracts with health insurers who agreed to provide QHPs on the Exchanges, including Cigna.  These contracts involved an exchange in which the health insurers agreed to offer QHPs on the Exchanges in return for the Government's commitment to the risk corridors program, which would limit insurers' downside and upside risk of offering those QHPs.

53.      HHS's intent to enter into these contracts is clear.  For example, a July 2011 rule-making notice explained that the "transitional risk corridor program . . . will apply to the qualified health plans in the individual and small group markets for the first three years of Exchange operation (2014–2016)," and not to other plans that did not agree to offer QHPs on the ACA Exchanges. 76 Fed. Reg. 41,929, 41,931 (July 15, 2011).  Thus, the risk corridors program was not a regulatory program applicable to all health insurers, but a program offered only and specifically to participating insurers.

54.      HHS also explained that the risk corridors program would "provide payments to health insurance issuers" who agreed to "cover higher-risk populations" by offering QHPs on the Exchanges, and whose premium failed to offset the cost of the high-cost enrollees.  76 Fed. Reg. at 41,931.  This agreement would avoid the problem of "an issuer being more cautious about offering certain plan designs in the Exchange" when it lacked sufficient information about the risk pool it would be covering.  *Id.*

55.      HHS echoed its understanding of the risk corridor program as a contractual exchange in its preliminary regulatory impact analysis:  "Risk adjustment, reinsurance, and risk corridors . . . play a critical role in ensuring the success of the Exchanges. Risk corridors encourage

health insurance issuers to offer QHPs on Exchanges in the first three years of their operation by ensuring that all issuers share the risk associated with initial uncertainty in the pricing of QHPs."[8]

56.     HHS's final rule regarding the premium stabilization program articulated more specifically the terms of its contractual bargain with insurers:

> [R]isk corridors create a mechanism for sharing risk for allowable costs between the Federal government and QHP issuers. QHP issuers with allowable costs that are less than 97 percent of the QHP's target amount will remit charges for a percentage of those savings to HHS, while QHP issuers with allowable costs greater than 103 percent of the QHP's target amount will receive payments from HHS to offset a percentage of those losses.

77 Fed. Reg. 17,220, 17,236 (Mar. 23, 2012).  HHS also confirmed that the risk corridor program applied only to health insurers who agreed to provide QHPs.  *Id.* at 17,237.

57.     The final regulatory impact statement again reiterated that HHS intended the risk corridors program to "share the risk" in exchange for insurers' agreement to offer QHPs: "Risk corridors encourage health insurance issuers to offer QHPs on Exchanges in the first three years of their operation by ensuring that all issuers share the risk associated with initial uncertainty in the pricing of QHPs."  March 2012 Impact Analysis at 11.

58.     HHS issued additional regulations in March 2013, further specifying the terms of the contractual bargain, including how payments would be calculated.  HHS again specified the contractual exchange contemplated by the program, *i.e.*, that it would "provide payments to health insurance issuers that cover higher-risk populations."  78 Fed. Reg. 15,410, 15,411 (Mar. 11, 2013).

59.     HHS has confirmed that the risk corridors program involves a contractual exchange by explaining in 2014 that payments from health insurers under the program are "user fees" paid

---

[8] CMS, *Preliminary Regulatory Impact Analysis* (July 2011) at 11, https://www.cms.gov/CCIIO/Resources/Files/Downloads/cms-9989-p2.pdf.

at the user's option in exchange for the Government's provision of a special good or service, rather than a tax or regulatory fee applicable involuntarily and generally.  Burwell Letter at 1–2.  HHS also explained that the risk corridors payments from insurers to HHS were user fees because the risk corridors program provided "special benefits" only to insurers who agreed to offer plans in the health insurance exchanges:  "QHPs enjoy a special benefit resulting from the operation of the risk corridors program, in that the fees charged are ultimately utilized to balance risks among the QHPs . . . ." *Id.* at 2.

60.    HHS's establishment of the risk corridors program constituted an offer to make the required risk corridor payments to health insurers in exchange for the insurers' agreement to offer QHPs on the Exchanges and to pay the appropriate fees to HHS if their premiums exceeded claims and other costs by more than the designated amount.

61.    Cigna accepted HHS's offer when it agreed to offer QHPs on the Exchanges for 2014, 2015, and 2016.  When Cigna agreed to offer QHPs on the Exchanges for each calendar year, both Cigna's and the Government's rights and obligations under the ACA's risk corridors insurance program were fixed for that calendar year.  That is, if Cigna's claims experience for a given year was more negative than expected, HHS had to pay Cigna.  If the reverse was true, Cigna had to pay HHS.  Cigna's acceptance of HHS's offers thus formed binding implied-in-fact con-tracts between HHS and Cigna for each calendar year.

62.    In September 2016, the Government announced that it would continue to prorate the risk corridors payments owed to QHPs for 2015 and 2016.  *See* 2015 Announcement.

**F.    The Government fails to make risk corridors payments due to Cigna**

63.    In October 2015, after collecting risk corridors data from QHPs for 2014, HHS and CMS announced that they intended to prorate the risk corridors payments owed to QHPs, including to Cigna, for 2014:  "Based on current data from QHP issuers' risk corridors submissions,  issuers

will pay $362 million in risk corridors charges, and have submitted for $2.87 billion in risk corridors payments for 2014. *At this time, assuming full collections of risk corridors charges, this will result in a proration rate of 12.6 percent*."[9] By contrast, CMS announced, risk corridors charges owed by QHPs to HHS "are not prorated."[10]

64.     In the Colorado and Tennessee ACA Individual Markets for benefit year 2014, Cigna earned gains sufficient to require it to remit risk corridors charges to the Secretary of HHS. *See* 2014 Bulletin Tbls. 6, 43. Cigna paid 100% of those risk corridors charges promptly.

65.     In its remaining ACA Individual Markets for benefit year 2014, Cigna lost money such that the Government was required to make risk corridors payments to Cigna. The Government, however, paid only a prorated portion thereof. *See id.* Tbls. 3, 10, 44.

66.     For benefit years 2015 and 2016, the Government applied risk corridor charges in those years collected from QHPs to make additional payments toward 2014 benefit year balances. But losses dwarfed collections such that the majority of risk corridors payments owed by the Government for benefit year 2014 to Cigna remains unpaid.

67.     The Government owes Cigna additional amounts for risk corridors obligations for benefit years 2015[11] and 2016.[12]

68.     The Government has paid Cigna nothing for benefit years 2015 and 2016.

---

[9] Bulletin, CMS, *Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015) (emphasis added), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf.

[10] Bulletin, CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015) ("2014 Bulletin"), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf.

[11] *See* Bulletin, CMS, *Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year* (Nov. 18, 2016), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf.

[12] *See* Bulletin, CMS, *Risk Corridors Payment and Charge Amounts for the 2016 Benefit Year* (Nov. 15, 2017), https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-Amounts-2016.pdf.

69.     Because 2016 was the last year of the risk corridors program, there are no more "payments in" to the program and hence no prospects of future "payments out" under the Government's budget-neutral approach.

70.     Across the 2014–2016 benefit years, the Government owes Cigna risk corridors payments totaling $120,209,425.82.   These sums are presently due.

71.     Cigna has exhausted its non-judicial avenues to remedy the Government's failure to make the full and timely risk corridors payments.

## II.     COST-SHARING REDUCTIONS

### A.     The Affordable Care Act's cost-sharing reduction program

72.     Low-income people may not be able to afford insurance on the Exchanges if the out-of-pocket costs they pay when they use their insurance are too high.   These costs include co-payments, coinsurance, and deductibles.   The ACA refers to these payments as "cost-sharing," because the person receiving treatment is sharing the cost of that treatment with his or her insurance company.   People with incomes between 100% and 250% of the federal poverty level are eligible to have their cost-sharing obligations reduced.

73.     To accomplish this, the ACA requires issuers of qualifying health plans to reduce—that is, absorb a portion of—cost-sharing obligations for eligible persons pursuant to Section 1402 of the ACA.   42 U.S.C. § 18071.   In turn, Section 1402 requires the Government to reimburse the issuers for these amounts, which are referred as CSR payments or reimbursements.   This process, of course, makes health coverage more affordable.

74.     After three years, the Government abruptly stopped paying CSR reimbursements, asserting that Congress never appropriated funds for that purpose.   Even so, insurers like Cigna

Health are obligated by law to keep making CSR payments to their customers' health care provid-ers—and they have done so. The Government's refusal to honor its reimbursement obligations harms the insurers, makes it harder for people to afford health insurance, and unsettles the insur-ance markets.

75.     Section 1402 sets forth both issuers' obligations to make CSR payments and the Government's obligation to reimburse these expenses. 42 U.S.C. § 18071. "In the case of an eligible insured enrolled in a qualified health plan"—that is, a person with a qualifying income who buys a silver plan, *id*. § 18071(c)(1)–(2)—"(1) the Secretary shall notify the issuer of the plan of such eligibility; and (2) the issuer shall reduce the cost-sharing under the plan at the level and in the manner specified in subsection (c)." *Id.* § 18071(a). The issuer's cost-sharing obligation includes "deductibles, coinsurance, copayments, or similar charges." *Id.* § 18022(c)(3). And the Government must fully reimburse the issuer for these payments: "An issuer of a qualified health plan making [cost-sharing] reductions under this subsection shall notify the Secretary of such re-ductions and *the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions*." *Id.* § 18071(c)(3)(A) (emphasis added).

76.     The ACA also creates a program for making "advance payments" to issuers for these CSR reimbursements: "The Secretary shall also notify the Secretary of the Treasury and the Exchange under paragraph (1) if an advance payment of the cost-sharing reductions . . . is to be made to the issuer of any qualified health plan with respect to any individual enrolled in the plan. The Secretary of the Treasury *shall make such advance payment* at such time and in such amount as the Secretary specifies in the notice." 42 U.S.C. § 18082(c)(3) (emphasis added).

77.     The statute's implementing regulations therefore set up "a payment approach under which HHS would make monthly advance payments to issuers to cover projected cost-sharing

reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts."[13]  *See* 45 C.F.R. § 156.430(b)–(d) (providing that an "issuer will receive periodic advance payments" for the CSR program); 78 Fed. Reg. 15,409, 15,486 (Mar. 11, 2013) (explaining that the Government will make "monthly advance payments to issuers to cover project cost-sharing reduction amounts").  Based on the year-end reconciliation, the Government would reimburse the issuer "any amounts necessary to reflect the CSR provided or, as appropriate, the issuer [would] be charged for excess amounts paid to it."[14]

78.    Nothing in Section 1342 or the tax code limits the Government's obligation to pay QHPs the full amount of risk corridors payments due.

**B.    The controversy over whether Congress appropriated funds for CSR reimbursements**

79.    After the ACA's passage, a controversy developed over whether Congress appropriated funds for CSR reimbursements.  The ACA amended 31 U.S.C. § 1324—which establishes a permanent appropriation of "[n]ecessary amounts . . . for refunding internal revenue collections as provided by law," including "refunds due from" specified provisions of the tax code—to include "refunds due from" Section 1401 of the ACA.  Section 1401 provides a tax credit to help offset the cost of monthly insurance premiums for certain low-income persons.  Those credits are called premium tax credits.  The Obama administration relied on the appropriation for premium tax credits to pay both the premium tax credits under Section 1401 and the CSR reimbursements under Section 1402.

---

[13] CMS, *HHS Notice of Benefit and Payment Parameters for 2014* at 7 (March 11, 2013), https://www.cms.gov/CCIIO/Resources/Files/Downloads/payment-notice-technicalsummary-3-11-2013.pdf.

[14] CMS, *Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015* at 28 (March 16, 2016), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS_Guidance_on_CSR_Reconciliation-for_2014_and_2015_benefit_years.pdf; *see also* 45 C.F.R. 156.430(e).

80.    In April 2013, the Office of Management and Budget submitted a budget request to Congress that included a line-item appropriation for the payment of cost-sharing reductions. *See* Fiscal Year 2014 Budget of the United States Government, App'x 448 (Apr. 10, 2013).  HHS likewise requested "an appropriation in order to ensure adequate funding to make payments to issuers to cover reduced cost-sharing in FY 2014."[15]  Congress did not provide the requested line-item appropriation, either then or later.  Nor did Congress repeal or amend the CSR provision.  And Congress has never enacted statutory or appropriations language barring the Government from using any funds or accounts to make CSR payments.

81.    In January 2014, the Obama administration began making monthly advance CSR payments, citing Section 1324 as the relevant appropriation.  The Government ultimately made timely, monthly CSR payments for 45 months—from January 2014 through September 2017.

82.    In November 2014, the House of Representatives sued HHS and the Treasury, seeking to prevent "any further Section 1402 Offset Program payments to Insurers unless and until a law appropriating funds for such payments is enacted."  Complaint at 27, *House v. Burwell*, No. 1:14-cv-1967-RMC (D.D.C. Nov. 21, 2014) (ECF No. 1).  The House alleged that "Congress has not, and never has, appropriated any funds (whether through temporary appropriations or permanent appropriations) to make any Section 1402 Offset Program payments to Insurers."  *Id.* ¶ 28.  The administration countered that Section 1324 provides a permanent appropriation for both premium tax credits and CSR reimbursements, and that the two sets of payments are "legally intertwined" and both serve "to reduce the premiums payable by individuals eligible for such credit." Defs.' Mem. ISO Mot. for Summ. J. at 11, *Burwell*, No. 1:14-cv-1967-RMC (D.D.C. Dec. 2, 2015) (ECF No. 55-1).

---

[15] *See* HHS, *Fiscal Year 2014, CMS, Justification of Estimates for Appropriations Committees* at 184 (Apr. 10, 2013) https://www.cms.gov/about-cms/agency-information/performancebudget/downloads/fy2014-cj-final.pdf.

83.   The district court ruled for the House, holding that the ACA "unambiguously appropriates money for Section 1401 premium tax credits but not for Section 1402 reimbursements to insurers." *House v. Burwell*, 185 F. Supp. 3d 165, 168 (D.D.C. 2016). And the court found no other source of appropriation for CSR payments. *Id*. at 174–75. It thus enjoined the payment of any more CSR reimbursements, but stayed the injunction pending appeal. *Id.* at 189.

84.   The House appealed, but after the 2016 election, the parties reached a settlement, agreeing that "the district court's holding on the merits should not in any way control the resolution of the same or similar issues should they arise in other litigation" and "waiv[ing] any right to argue that the judgment of the district court or any of the district court's orders or opinions in this case have any preclusive effect in any other litigation." Settlement Agreement, *Burwell*, No. 1:14-cv-1967-RMC (D.D.C. Dec. 15, 2017) (ECF No. 83-1). The district court thus vacated its decision enjoining payment of CSR reimbursements. Order, *Burwell*, No. 1:14-cv-1967-RMC (D.D.C. May 18, 2018) (ECF No. 88).

85.   The Government continued paying CSR reimbursements while the litigation unfolded. In October 2017, however, Attorney General Sessions sent a letter to Treasury and HHS advising that Section 1324 could not be used to fund CSR reimbursements. He asserted that Section 1324's permanent appropriation applies only to premium tax credits under Section 1401, and not also to CSR reimbursements under Section 1402. As such, he stated there was no appropriation to pay CSR reimbursements. HHS therefore announced that "CSR payments to issuers must stop, effective immediately."[16]

---

[16] Mem. from E. Hargan to S. Verma re: Payments to Issuers for Cost-Sharing Reductions (CSRs) (Oct. 12, 2017), https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf.

### C.     The Government's refusal to honor its CSR reimbursement obligations

86.     The Government's refusal to make the statutorily mandated CSR payments harms issuers like Cigna Health, increases health care costs, and upsets the insurance markets.  Whether or not the Government reimburses them, issuers must still provide the cost-sharing reductions to their insureds—at great cost.  The Congressional Budget Office estimated that CSR reimbursements to issuers would be $7 billion in fiscal year 2017, $10 billion in 2018, $11 billion in 2019, and $16 billion by 2027.  Faced with these massive unrecouped costs, insurers have only two choices:  leave the ACA marketplaces, or raise premiums.[17]

87.     Both consequences are already occurring.  Some issuers have left the Exchanges.  For example, Anthem announced in 2017 that it would no longer offer individual coverage via the Nevada Exchange, citing "continual changes and uncertainty in federal operations, rules and guidance, including cost sharing reduction subsidies."[18]  Elsewhere, premiums jumped between 7% and 38%.[19]  These dramatic increases make it much harder for low- and middle-income people to afford health insurance coverage.  And even if insurers raise premiums going forward, they cannot retroactively raise the premiums for 2017, which were set when the Government was complying with its CSR payment obligations.

88.     Cigna Health is in the same boat.  Like other issuers, it must still provide cost-sharing reductions to eligible insureds, even though the Government refuses to reimburse those costs.  Cigna Health has complied with that obligation since the CSR program began, and has

---

[17] Larry Levitt, Cynthia Cox, and Gary Claxton, Kaiser Family Foundation, *The Effects of Ending the Affordable Care Act's Cost-Sharing Reduction Payments*, (Apr. 25, 2017), https://www.kff.org/health-reform/issue-brief/the-effects-of-ending-the-affordable-care-actscost-sharing-reduction-payments/.

[18] Anthem Statement on Individual Market Participation in Nevada (Aug. 7, 2017), https://www.anthem.com/press/nevada/anthem-statement-on-individual-market-participation-innevada/.

[19] Rabah Kamal et al., Kaiser Family Foundation, *How the Loss of Cost-Sharing Subsidy Payments is Affecting 2018 Premiums* (Oct. 27, 2017), https://www.kff.org/healthreform/issue-brief/how-the-loss-of-cost-sharing-subsidy-payments-is-affecting-2018-premiums/.

always timely submitted its required CSR reports to HHS.  It is thus owed CSR reimbursements for October, November, and December 2017, and for the 2018 and 2019 benefit years.  These losses harm Cigna Health's bottom line, and they impair its ability to design and price plans for the ACA Exchanges.

89.     For 2017, Cigna Health incurred, and is owed reimbursement for, at least $7,189,574 in CSR obligations.

90.     For 2018, Cigna Health incurred, and is owed reimbursement for, at least $188,685,842 in CSR obligations.

91.     For 2019, Cigna Health incurred, and is owed reimbursement for, additional CSR obligations, in exact amounts subject to proof at trial.

92.     Cigna Health has exhausted its non-judicial avenues to remedy the Government's failure to make the full and timely risk corridors payments.

## COUNT I:
## Violation of federal statute and regulation (Risk corridors)

93.     Cigna realleges and incorporates the preceding allegations.

94.     Section 1342(b)(1) of the ACA mandates compensation, expressly stating that the Secretary of HHS "shall pay" risk corridors payments to QHPs in accordance with the payment formula set forth in the statute.  This language "imposed a legal duty of the United States that could mature into a legal liability through the insurers' actions—namely, their participating in the healthcare exchanges."  *Maine Cmty. Health Options*, 2020 WL 1978706, at *8.

95.     HHS's and CMS's implementing regulation at 45 C.F.R. § 153.510(b) also mandates compensation, expressly stating that HHS "will pay" risk corridors payments to QHPs in accordance with the payment formula set forth in the regulation, which is mathematically identical to the statutory formula.

96.     HHS's and CMS's regulation at 45 C.F.R. § 153.510(d) requires a QHP to pay charges to HHS within 30 days of notice thereof, and "payment deadlines should be the same for HHS and QHP issuers." 76 Fed. Reg. 41,929, 41,943 (July 15, 2011); *accord* 77 Fed. Reg. 17,219, 17,238 (Mar. 23, 2012).

97.     As a QHP issuer in 2014, 2015, and 2016, Cigna qualified for risk corridors payments from the Government.  Cigna is thus entitled under Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) to recover full and timely mandated risk corridors payments from the Government for 2014, 2015, and 2016.

98.     The Government has failed to make these payments, even though it repeatedly confirmed in writing that Section 1342 requires the Government to make "full payment" of risk corridors amounts.

99.     Congress's failure to appropriate sufficient funds for risk corridors payments does not defeat or otherwise abrogate the United States's statutory obligation to make full and timely risk corridors payments to QHPs, including to Cigna.  "[T]he plain terms of the Risk Corridors provision created an obligation neither contingent on nor limited by the availability of appropriations or other funds." *Maine Cmty. Health Options*, 2020 WL 1978706, at *10.

100.    The Government's failure to make full and timely risk corridors payments to Cigna for 2014–2016 violates the Government's mandatory payment obligations under Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b).

101.    Section 1342 is a money-mandating statute that both supplies jurisdiction in this Court and gives Cigna a cause of action for damages.  "Section 1342's triple mandate—that the HHS Secretary 'shall establish and administer' the program, 'shall provide' for payment according to the statutory formula, and 'shall pay' qualifying insurers—falls comfortably within the

class of money-mandating statutes that permit recovery of money damages in the Court of Federal Claims." *Maine Cmty. Health Options*, 2020 WL 1978706, at *15.

102.    Because of the Government's violation of Section 1342(b)(1) and 45 C.F.R. § 153.510(b), Cigna has been damaged in the amount of at least $120,209,425.82, together with interest, costs of suit, and such other relief as this Court deems just and proper.

**COUNT II:**
**Breach of implied-in-fact contracts (Risk corridors)**

103.    Cigna realleges and incorporates the preceding allegations.

104.    Cigna entered into valid implied-in-fact contracts with the Government under which the Government agreed to make full and timely risk corridors payments to Cigna for 2014, 2015, and 2016, respectively, in exchange for Cigna's agreement to become a QHP issuer and participate in the Exchange marketplace for those years.

105.    Section 1342 of the ACA, HHS's implementing regulations (45 C.F.R. §153.510), and HHS's and CMS's admissions regarding their obligation to make risk corridors payments, were made by representatives of the Government who had actual authority to bind the United States, and constituted a clear and unambiguous offer to make full and timely risk corridors payments to health insurers, including to Cigna, that agreed to participate as QHPs in the Exchanges.

106.    Cigna accepted the Government's offer by agreeing to become a QHP issuer and to participate in and accept the uncertain risks imposed by the Exchanges for the 2014–2016 benefit years.

107.    By agreeing to become a QHP, Cigna agreed to provide health insurance on the Exchanges in which it participated, and to accept the obligations, responsibilities, and conditions imposed on QHPs under the ACA and its implementing regulations.  That includes the obligation

to pay a "user fee" to the Government under the risk corridor program if Cigna's premiums exceeded claims and other costs by more than the designated amount.

108.    Cigna satisfied and complied with its obligations and/or conditions which existed under these implied-in fact contracts.

109.    The Government's agreement to make full and timely risk corridors payments was a significant factor material to Cigna's agreement to become a QHP issuer.

110.    The parties' agreement is further confirmed by their conduct, performance, and statements after Cigna's acceptance of the Government's offer; Cigna's execution of attestations regarding risk corridors payments and charges; and the Government's repeated assurances that full and timely risk corridors payments would be made and would not be subject to budget limitations.

111.    The implied-in-fact contracts for 2014–2016 were authorized by representatives of the Government who had actual authority to bind the Government and were entered into with mutual assent and consideration by both parties.

112.    The risk corridors program's protection from uncertain risk and new market instability was a real benefit that significantly influenced Cigna's decision to agree to become a QHP and to participate in the Exchanges for 2014–2016.

113.    Cigna provided a real benefit to the Government by becoming a QHP, participating in the Exchanges for 2014–2016, and paying "user fees" to the Government under the risk corridor program when Cigna's premiums exceeded claims and other costs by more than the designated amount.

114.    The Government repeatedly acknowledged its obligations to make full and timely risk corridors payments to qualifying QHPs for 2014–2016 through its conduct and statements to

the public and to Cigna and other similarly situated QHPs, made by representatives of the Government who had actual authority to bind the Government.

115.    Congress's failure to appropriate sufficient funds for risk corridors payments due for 2014–2016 did not defeat or otherwise abrogate the Government's contractual obligation to make full and timely risk corridors payments to Cigna.

116.    The Government's failure to make full and timely 2014–2016 risk corridors payments to Cigna is a material breach of the parties' implied-in-fact contracts.

117.    As a result of the Government's material breaches, Cigna has been damaged in the amount of at least $120,209,425.82, together with any losses actually sustained as a result of the Government's breach, damages, interest, costs of suit, and such other relief as this Court deems just and proper.

**COUNT III:**
**Violation of federal statute and regulation (CSR)**

118.    Cigna Health realleges and incorporates the preceding allegations.

119.    Under Section 1402 of the ACA and its implementing regulations, the Government "shall make periodic and timely payments" to any issuer for an amount "equal to the value of" the cost-sharing reductions the issuer provided to eligible customers under the Act. 49 U.S.C. § 18071(c)(3)(A). Section 1402's unambiguous "shall make" language indicates a binding obligation to pay.

120.    In turn, the implementing regulations dictate the timing of the Government's payment obligation. HHS's rules entitle issuers to full CSR payments in advance of their actual incurred costs. *See* 45 C.F.R. § 156.430(b)(1). Thus, the ACA and its implementing regulations together commit the Government to making full advance CSR payments.

121.    The Government's history of making 45 consecutive such payments supports this understanding of the payment obligation and required payment schedule.

122.    Cigna Health is an issuer of qualified health plans and has provided cost-sharing reductions to eligible insureds in compliance with the ACA, in the following amounts:

    A.    For 2017:  $7,189,574.

    B.    For 2018:  $188,685,842.

    C.    For 2019:  Additional amounts subject to proof at trial.

123.    The United States has failed, without justification, to perform its statutory and regulatory obligations to reimburse Cigna Health for these cost-sharing reductions.  Indeed, the Government has declared unequivocally that it will not satisfy those obligations.

124.    The Government's failure to provide periodic and timely CSR payments to Cigna Health violates Section 1402 of the ACA and its implementing regulations, injuring Cigna Health in the amounts set forth above.

125.    Section 1402 is a money-mandating statute that both supplies jurisdiction in this Court and gives Cigna Health a cause of action for damages.

126.    Congress's failure to appropriate sufficient funds for CSR payments does not defeat or otherwise abrogate the United States's statutory obligation to make full and timely CSR payments to QHPs, including to Cigna Health.

127.    As a result of the Government's violation of Section 1342(b)(1) and 45 C.F.R. § 153.510(b), Cigna Health has been damaged in the amount of at least $195,875,416 (the total for 2017 and 2018 CSR payments), plus the amounts incurred for 2019, which are forthcoming, together with interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT IV:
### Breach of implied-in-fact contracts (CSR)

128.    Cigna Health realleges and incorporates the preceding allegations.

129.    The United States entered into a valid implied-in-fact contract with Cigna Health obligating the Government to make full and timely advance CSR payments in exchange for Cigna Health's voluntary agreement to participate as a qualified health plan issuer in the ACA Exchanges and undertake the accompanying obligations, including by providing cost-sharing reductions to Cigna Health's eligible insureds.

130.    The implied-in-fact contract to make CSR payments was authorized by represent-atives of the Government who had actual authority to bind the Government and were entered into with mutual assent and consideration by both parties.

131.    The Secretary of HHS had authority to enter into a valid contract with Cigna Health. The Secretary is responsible for administering the ACA, which creates a contractual framework that the Secretary is charged with implementing.  Entering into contracts pursuant to the contrac-tual structure of the CSR program is therefore integral to the Secretary's duties.

132.    Congress made an unambiguous promise to repay issuers for their CSR expenses in the ACA and its implementing regulations.  That commitment—that issuers would not be ex-pected to shoulder the cost of the Government's CSR subsidy and would receive full advanced payment—was designed to entice issuers like Cigna Health to participate voluntarily in the Ex-changes.

133.    The ACA and its implementing regulations thus constituted an offer to enter into a contract.  Cigna Health accepted that offer by performing its half of the bargain—that is, by de-veloping and selling plans on an Exchange and providing CSR discounts to eligible insureds. Cigna Health expended resources to develop plans that complied with the ACA, sold qualified

health plans on the Exchanges, and made payments to eligible customers to reduce their out-of-pocket expenses, as the ACA required.

134.    In this bargain, Cigna Health agreed to issue qualified health plans and act as a conduit for the Government's CSR subsidy.  In return, the Government agreed to reimburse Cigna Health for its CSR expenses.  There was thus meaningful consideration, in a traditional exchange of agreements.

135.    The surrounding circumstances reinforce the existence of a contractual agreement. The ACA and its implementing regulations use unequivocal promissory language leading issuers like Cigna Health to believe reasonably that they would be repaid under the CSR program. No language in those provisions undermines Cigna Health's expectations that it would be repaid.

136.    The exchange is also equitable:  The ACA's success hinges on private health insurers' voluntary participation in the Exchanges, and the CSR program's design makes issuers the sole means for distributing these out-of-pocket healthcare costs to select recipients.

137.    Cigna Health has continued to perform its half of the bargain throughout the life of the implied-in-fact contract.  Cigna Health has provided cost-sharing reductions to eligible insureds, in the following amounts:

    A.     For 2017:  $7,189,574.

    B.     For 2018:  $188,685,842.

    C.     For 2019:  Additional amounts subject to proof at trial.

138.    The United States has failed, without justification, to perform its contractual obligations to reimburse Cigna Health for these cost-sharing reductions.  Indeed, the Government has declared unequivocally that it will not satisfy those obligations.  This failure and refusal are material breaches of the parties' implied-in-fact contract.

139.    Congress's failure to appropriate sufficient funds for CSR payments does not defeat or otherwise abrogate the United States's contractual obligation to make full and timely CSR payments to QHPs, including to Cigna Health.

140.    As a result of the Government's material breach, Cigna Health has been damaged in the amount of at least $195,875,416 (the total for 2017 and 2018 CSR payments), plus the amounts incurred for 2019, which are forthcoming, together with any losses actually sustained as a result of the Government's breach, damages, interest, costs of suit, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant awarding:

(1)    For Count I, damages sustained by Cigna of at least $120,209,425.82, subject to proof at trial, due to Defendant's violation of ACA Section 1342(b)(1) and 45 C.F.R. § 153.510(b) regarding the risk corridors payments for benefit years 2014–2016;

(2)    For Count II, damages sustained by Cigna of at least $120,209,425.82, subject to proof at trial, together with any losses actually sustained as a result of the Government's breach, and reliance damages, due to Defendant's breaches of its implied-in-fact contracts with Cigna regarding the risk corridors payments for benefit years 2014–2016;

(3)    For Count III, damages sustained by Cigna Health of at least $195,875,416, plus the amounts incurred for 2019, subject to proof at trial, as a result of the Defendant's violation of ACA Section 1402 and 45 C.F.R. § 156.430 regarding the cost-sharing reduction payments from October 2017 to the present;

(4)    For Count IV, damages sustained by Cigna Health of at least $195,875,416, plus the amounts incurred for 2019, subject to proof at trial, together with any losses actually sustained

as a result of the Government's breach, and reliance damages, due to Defendant's breaches of its implied-in-fact contracts with Cigna Health regarding the cost-sharing reduction payments from October 2017 to the present;

(5)     All available attorneys' fees and costs;

(6)     All available interest, including pre- and post-judgment interest; and

(7)     Such other and further relief as the Court deems just and equitable.

May 1, 2020                                    Respectfully submitted,

                                               /s/ *Howard J. Stanislawski*
                                               Howard J. Stanislawski
*Of Counsel*:                                  SIDLEY AUSTIN LLP
                                               1501 K Street NW
Thomas D. Cunningham                           Washington, DC 20005
SIDLEY AUSTIN LLP                              (202) 736-8000
One South Dearborn Street                      hstanislawski@sidley.com
Chicago, IL 60603
(312) 853-7000                                 *Counsel for Plaintiffs Cigna Health and*
tcunningham@sidley.com                         *Life Insurance Company, Cigna*
                                               *Healthcare of Arizona, Inc., and Cigna*
William A. Sarraille                            *Healthcare of Texas, Inc.*
Tobias S. Loss-Eaton
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
tlosseaton@sidley.com